UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x
DRUG MART PHARMACY CORP., et al.,                                        :
                                                                        :
                                      Plaintiffs,                       :          MEMORANDUM &
                                                                        :          ORDER
                   -against-                                            :          93-CV-5148 (ILG)
                                                                        :
AMERICAN HOME PRODUCTS CORP., et al. ,                                  :
                                                                        :
                                      Defendants.                       :
                                                                        :
----------------------------------------------------------------------- x
GOLD, STEVEN M., U.S.M.J.:

     Now pending before the Court is a motion for summary judgment brought by defendants

seeking dismissal of Robinson-Patman Act claims asserted by twenty-eight plaintiffs.  Docket

Entry 677.  The parties have consented to have defendants' motion decided by the undersigned

Magistrate Judge.  Docket Entry 683.  For the reasons stated below, defendants' motion is

granted.

     This complex, long-pending antitrust litigation has been the subject of numerous written

decisions by various courts.  A sampling of those decisions is listed in *Drug Mart Pharmacy*

*Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 390 (E.D.N.Y. 2007).[1]  Accordingly,

familiarity with the facts and procedural background of the case is presumed, and is reviewed

here only briefly.

     In short, plaintiffs are a number of individually-owned retail pharmacies.[2] Plaintiffs

allege that defendants, five manufacturers of brand name prescription drugs ("BNPDs"), offered

---

[1] *See also Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 378 F. Supp. 2d 134 (E.D.N.Y. 2005); *In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372 (Jud. Pan. Mult. Lit. 2003); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 240537 (N.D. Ill. May 27, 1994).
[2] Plaintiffs originally consisted of 3,700 retail pharmacies operating at 3,987 locations.  Def. R.56.1 ¶ 9, Docket Entry 679; Pl. R.56.1 ¶ 9, Docket Entry 685.  As of March, 2010, 894 retail pharmacies remained as plaintiffs

discounts and rebates to plaintiffs' competitors but not to plaintiffs, and that this constitutes price discrimination in violation of the Robinson-Patman Act.

## BACKGROUND

### A. Early Procedural History

At the beginning of this case, a variety of plaintiffs including chain stores as well as individually-owned retail pharmacies brought antitrust claims under both the Robinson-Patman Act, 15 U.S.C. § 13, and the Sherman Act, 15 U.S.C. § 1. The case was consolidated for all pretrial purposes as a multi-district litigation in the Northern District of Illinois. Def. R.56.1 ¶ 10. *See also In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372 (Jud. Pan. Mult. Lit. 2003).

Each of the chain store plaintiffs settled its claims years ago. A Sherman Act class of individually-owned retail pharmacies was certified in 1994. *In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d at 1374. The plaintiffs in this action opted out of the class. The Sherman Act class plaintiffs settled their claims against several of the defendants and proceeded to trial before United States District Judge Kocoras in the Northern District of Illinois against the others. The Court entered a directed verdict in defendants' favor after trial. *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 639173, at *2 (N.D. Ill. Aug. 17, 1999); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1999 WL 33889 (N.D. Ill. Jan. 19, 1999) (granting defendants judgment as a matter of law).

---

pursuing damages. Docket Entry 615. In June 2010, plaintiffs stipulated to the dismissal of claims by 3,101 pharmacy locations. Docket Entry 626.

The five defendants remaining in the action are (1) Abbott Laboratories, (2) Johnson & Johnson, (3) Novartis Pharmaceuticals Corp. (formerly Ciba-Geigy and Sandoz), (4) Pfizer Inc. (including two indirect wholly-owned subsidiaries: G. D. Searle LLC, formerly known as G. D. Searle & Co., and Pharmacia & Upjohn Company LLC, formerly known as Pharmacia & Upjohn Company), and (5) Rhone-Poulenc Rorer, Inc. ("RPR") and Hoechst Marion Roussel, Inc., ("HMR"), whose parent companies merged in 1999. Def. Mem. 1 n.1, Docket Entry 678.

On April 21, 1995, Judge Kocoras issued a case management order referred to as Pretrial Order No. 5 ("PTO 5").  This Order called upon the parties to identify twenty of the retail pharmacies that had opted out of the class action and five of the defendants to serve as representative or "Designated Parties."   Pursuant to the terms of the Order, discovery was stayed as to the non-designated parties until the conclusion of the first trial of a designated plaintiff's Robinson-Patman claim; upon the expiration of the stay, the non-designated plaintiffs would have eight months to complete fact and expert discovery on their Robinson-Patman Act claims. PTO 5 ¶ 5.

Both the Sherman and Robinson-Patman Act claims of the individual retail pharmacies that opted out of the class were remanded and consolidated before this Court sometime after the entry of Pretrial Order No. 5.   In 2005, the parties settled their Sherman Act claims, leaving only plaintiffs' Robinson-Patman claims pending.  Docket Entry 519.  Apparently anticipating this possibility, Pretrial Order Number 5 provides that any damages recovered by a plaintiff who proceeds to trial on a Robinson-Patman Act claim must be reduced by any portion of those damages previously recovered in connection with the resolution of the plaintiffs' Sherman Act claims.  PTO 5 ¶ 11.

B.   *Dismissal of Designated Plaintiffs' Robinson-Patman Act Claims*

When the claims of the individual retail pharmacies were first transferred here, discovery had proceeded, as provided by PTO 5, only with respect to the designated parties.  Once the Sherman Act claims of all of the remaining parties were settled, the designated defendants moved for summary judgment on the Robinson-Patman Act claims of the designated plaintiffs.

In 2007, Senior United States District Judge I. Leo Glasser granted defendants' motion for summary judgment "relating to the [seventeen] representative plaintiffs' claims under the

Robinson-Patman Act . . . on the ground that plaintiffs have failed to show they are entitled to damages." *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 420-21 (E.D.N.Y. 2007) ("*Drug Mart II*").[3]   At that time, the designated plaintiffs were relying on an expert report that calculated damages based in part on the fact that plaintiffs paid more for BNPDs than favored purchasers did, and on generalized evidence indicating that the share of the market for BNPDs served by favored purchasers had grown while at the same time individual retail pharmacies had lost market share.  Judge Glasser rejected plaintiffs' reliance on the fact of a price differential "[b]ecause damages may not be based on the pricing margin caused by the discrimination, but [should be calculated based] on the estimates of plaintiffs' sales absent the discrimination."  *Id*. at 427.  With respect to plaintiffs' evidence of lost market share, Judge Glasser held that "[u]nder the Robinson-Patman Act, plaintiffs must carry their burden of proof to demonstrate that they *individually* suffered damages.  . . .  [H]ere, plaintiffs have failed to proffer evidence that specific plaintiff pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser."  *Id*. at 429 (emphasis added).

Having obtained summary judgment with respect to damages, defendants next sought dismissal of the designated plaintiffs' claims for injunctive relief.  Judge Glasser granted defendants' motion for summary judgment, reasoning that, under the particular circumstances presented here, plaintiffs' failure to establish damages was fatal to their injunctive relief claims. *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007) ("*Drug Mart III*").

C.  *Discovery Proceedings Culminating in the Pending Motion*

Pretrial Order No. 5 provides that judgments entered after trial or other dispositions of the claims of designated parties do not have res judicata or collateral estoppel effect on the claims of

---

[3] "*Drug Mart I*," a decision not directly relevant here, is reported at 378 F. Supp. 2d 134 (E.D.N.Y. 2005).

non-designated parties.  PTO 5 ¶ 12.  Thus, while Judge Glasser's rulings with respect to the designated plaintiffs are uniquely relevant and highly persuasive precedent, they neither bar nor resolve the claims of the non-designated plaintiffs.

After Judge Glasser dismissed the claims of the designated parties, approximately 3,700 individual retail pharmacy plaintiffs remained.  Def. R.56.1 ¶ 19.  Confronted with Judge Glasser's decision, these remaining plaintiffs devised a plan to gather evidence in discovery that might show "that specific plaintiff pharmacies lost sales of BNPDs manufactured by defendants to any specific favored purchaser."  *Drug Mart II*, 472 F. Supp. 2d at 429.  Pursuant to this plan, which came to be known as the "matching process," plaintiffs compiled lists of specific BNPD customers who no longer purchased drugs from them, and then searched the databases of non-party favored purchasers (and one favored purchaser who is a party) to see whether those same individuals were obtaining the same BNPDs from those favored purchasers.  The significance of the data developed by the matching process is at the heart of the pending summary judgment motion.

The precise contours of the matching process evolved over time.  Indeed, although as noted above Pretrial Order No. 5 contemplated that the non-designated parties would complete fact and expert discovery within eight months, the matching process took considerably longer than that; the process was not completed until May, 2011.  Docket Entry 666-1 ¶ 3.

The first conference at which the matching process was discussed in any detail was held on March 4, 2009.  At that time, I pressed plaintiffs to explain how they intended to prove that they sustained damages or injury as a result of defendants' price discrimination:

> [I]f you're not going to have a patient-specific theory, then I think you need to say so, live with it, and let the defendants test it if they want to.  If you are going to have a patient-specific theory, then identify the patients and ask the third parties what records they have of those patients and

produce your list of patients in an electronic form that's compatible with
the third parties from whom you're seeking discovery so that they can
cheaply and efficiently tell you which of your former patients are now
patients of theirs.

3/4/09 Tr., Docket Entry 586, at 10.  In response, plaintiffs represented that they would base their

case upon evidence that specific customers were lost to particular favored purchasers:

> [W]e are not suggesting that we would do anything other than put forth
> patient-specific information.  And we're not proposing any kind of
> extrapolations or use of aggregate data or anything like that.  . . .  As a
> pharmacist sits in his pharmacy as a plaintiff in this case, he is able to
> identify a certain universe of patients who he reasonably believes, based
> on his own personal knowledge and his own business records, is a lost
> customer in the sense that we mean it in this litigation, because he knows
> that that particular patient was getting a long-term maintenance drug from
> him for a period of years, and that patient is now in a plan where there is a
> mail-order pharmacy option, and the patient is now getting his
> maintenance drugs, or some of them at least, filled by the mail-order
> pharmacy.

*Id*. at 13-14.

Several court conferences were held to address the details of the matching process and

how it would be executed.  One such conference was held on November 13, 2009.  At that time,

plaintiffs reported that they had identified 1.2 million customers who had been purchasing

specific BNPDs from 500 plaintiffs but were no longer doing so.  Based on that preliminary data,

plaintiffs surmised that "at the end of the day we're going to have some material number that

isn't going to be three for a pharmacy, or five for a pharmacy."  11/13/09 Tr., Docket Entry 604,

at 16.

Yet another conference was held on March 24, 2010.  Plaintiffs' counsel reported that it

had now become clear that only 894 of the original 3,700 retail pharmacy plaintiffs would be

able to identify customers they believed they had lost to favored purchasers.  3/24/10 Tr., Docket

Entry 616, at 4.  Counsel predicted at that time that these 894 retail pharmacies would

demonstrate, through the matching process, that they had lost millions of transactions to favored purchasers.  *Id.* at 6.  In June 2010, the claims of 3,101 pharmacy locations were dismissed with prejudice by stipulation.  Def. R.56.1 ¶ 59; Stipulation of Dismissal, Docket Entry 626.

Another court conference was held after the matching process data had been analyzed and before defendants brought this motion for summary judgment.  At that time, plaintiffs raised the possibility that they would seek additional discovery before the motion was made.  8/11/11 Tr., Docket Entry 667, at 26.  Although I afforded plaintiffs an opportunity to apply to take additional discovery, *id.*at 26-27, they never did so.

1. *The Matching Process*

The parties ultimately entered into a stipulation that states in pertinent part that,

> after compiling a database of potential lost customers from their data, Plaintiffs have undertaken a so-called 'matching process' to identify which of those potential lost customers may have filled prescriptions at one of five so-called favored purchasers: Caremark, AdvancePCS, Express Scripts, and Medco (collectively, the "PBMs"), and Omnicare, a long-term care pharmacy. ***The matching process was designed to determine the universe of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants*** and was subject to the following limitations: (i) the universe of so-called favored purchasers was limited to the four PBMs and Omnicare; (ii) the universe of BNPDs was limited to manufacturer Defendants' top-selling maintenance drugs; and (iii) the time periods searched were limited to data currently maintained by the PBMs and the Plaintiffs.[4]

Stipulation ¶ 1, Docket Entry 666-1 (emphasis added).

In April, 2010, plaintiffs produced a list of potential lost customers from 831 pharmacy locations.[5]  Def. R.56.1 ¶ 58.  In light of the voluminous data involved and the expense of comparing plaintiffs' lists with those of the favored purchasers, a subset of thirty plaintiffs was randomly selected to participate in the first round of the matching process.  Def. R.56.1 ¶ 62.

---

[4] "PBMs" are pharmacy benefit managers.  Def. R.56.1 ¶ 39.
[5] Plaintiffs had previously produced a list of approximately 2,770,426 potential lost customers for 500 pharmacies. Def. R.56.1 ¶ 50.

Two of the thirty plaintiffs subsequently dismissed their claims, leaving twenty-eight pharmacies involved in the matching process.  Def. R.56.1 ¶¶ 63, 64.  These plaintiffs then compared their database of lost customers with electronically stored customer lists, some going back as far as 1998, from the five favored purchasers whose data were examined as part of the matching process.  Def. R.56.1 ¶¶ 40, 66.  The matching process employed the following criteria:

> If the alleged favored purchaser's data showed a mail order fill of the same drug (say, drug x) for a matched patient within six months of the last fill at the Plaintiff pharmacy, the transaction was . . . counted as a match. Any subsequent prescriptions for drug x, or a therapeutic alternative, were . . . counted as matches against the manufacturer of drug x as well.

Def. R.56.1 ¶ 67.

When the matching process was finally completed, the results were considerably less impressive than plaintiffs had anticipated.  *See* 3/23/12 Tr., Docket Entry 700, at 53 (plaintiffs' counsel's acknowledgement that they expected to see more matches).  As stated by defendants, the twenty-eight pharmacies participating in the matching process had identified from their own records approximately 164,501 potential lost customers for 168 BNPDs over a twelve-year time frame from 1998 to 2010.[6]  Def. R.56.1 ¶ 65.  *See also* Plaintiffs' Letter dated 5/29/09, Docket Entry 594 (identifying 168 BNPDs and a time frame applicable to each).  When plaintiffs' data was compared to the data of the five favored purchasers, approximately 5,500 matched potential lost customers and 17,346 matched potential lost transactions were identified.[7]  Def. R.56.1 ¶¶ 79, 80 (identifying 5,515 matched customers); *id.* ¶ 89 (identifying 5,454 matched customers);

---

[6] For purposes of statistical analysis, defendants point out that the equivalent of ten years of data was collected and analyzed.  Herscovici Decl. ¶ 13.  Plaintiffs originally identified thirteen favored purchasers and three distributors.  Tietjen Decl. Ex. 6, Docket Entry 686.  Three of the favored purchasers were able to produce data beginning from 1998.  Pl. R.56.1 ¶ 66.  Express Scripts matched data beginning from January, 2002; Advance PCS collected data from January, 2006.  *Id.*  Plaintiffs contend that Express Scripts, Medco and CVS/Caremark currently account for 50% of the PBM marketplace.  Pl. Opp. at 7 n.19, Docket Entry 684.

[7] Although defendants challenge several aspects of the results of the matching process as calculated by plaintiffs, I rely – as do defendants in large part – on plaintiffs' tabulations of matched lost customers for purposes of deciding the pending motion.

Herscovici Decl. ¶ 5 & n.3.[8]  Plaintiffs further refined the results of the matching process, and by the time they submitted their opposition to defendants' summary judgment motion, plaintiffs had calculated a total of 5,147 lost customers and 15,043 lost transactions.  Plaintiffs' Memorandum in Opposition ("Pl. Opp."), Docket Entry 684, at 22.

Some plaintiffs could not identify any matched customers at all with respect to BNPDs manufactured by one or more defendants, and those plaintiffs voluntarily dismissed their corresponding claims.  Stipulation and Order of Dismissal, Docket Entry 697; Pl. Opp. 22 (identifying individual pharmacies with zero matching results).  *See also* 3/23/12 Tr. at 60.  In addition, each of the more than 800 remaining plaintiffs has voluntarily dismissed its claims against defendant Hoffman La Roche as a result of the minimal number of matches with respect to this defendant by the twenty-eight plaintiffs.  Docket Entry 694.

As demonstrated by these results, only approximately 3% (5,147 of 164,501) of the potential lost customers plaintiffs culled from their own records could be "matched" to a customer who subsequently filled the same prescriptions with one or more favored purchasers. This implies, of course, that 97% of the customers plaintiffs identified as lost based upon their own records could not be found in the databases of favored purchasers searched during discovery.  Moreover, even these figures are substantially reduced if the 2,586 lost customers claimed by plaintiff Pharma-Card are excluded; as discussed below, Pharma-Card's results include a large number of customers claimed by plaintiffs but not identified by the matching process.

The results are even less significant when considered in context.  Defendants, relying on data reported by the National Community Pharmacists Association, point out that independent

---

[8] "Herscovici Decl." refers to the Declaration of Steven Herscovici, Ph.D., submitted in support of defendants' motion for summary judgment, Docket Entry 681.

retail pharmacies filled between 22,000 and 28,000 BNPD prescriptions per year during the period of time relevant to the matching process.[9]  In contrast, the data from the matching process reveals that, on average, each plaintiff pharmacy lost less than 200 (5,147/28) customers and only approximately 537 (15,043/28) transactions over the entire period examined by the matching process, or approximately 18 customers and 54 transactions per year.  Pl. Opp. 22-24. This average loss of 54 transactions per year is only about one quarter of one per cent of the more than 20,000 BNPD transactions conducted per year by the average retail pharmacy.

The de minimus nature of these results is further illustrated when they are broken down and analyzed by defendant.  According to defendants, when examined in this manner, the results are that approximately 88% of plaintiffs' claims against particular defendants are based on five or fewer lost customers per year.  Joint Memorandum of Law in Support of Individual Defendants' Motions for Summary Judgment," Docket Entry 678 ("Def. Mem.") at 3.[10]  On the other hand, plaintiffs calculate that, excluding the dismissed claims, approximately 31% of plaintiffs' remaining claims against particular defendants are based on five or fewer lost customers per year.  Pl. Opp. at 22.

Many pharmacies lost no more than ten customers per defendant over the relevant twelve-year time period, or less than one customer per year.  For example, 19 of the 28 pharmacy plaintiffs could identify only ten or fewer matched Novartis (formerly Ciba-Geigy and Sandoz) customers over the entire ten-plus year period, or less than one lost customer per year.  Pl. Opp.

---

[9] Although plaintiffs note that the five favored purchasers that were searched as part of the matching process account for only 50% of the PBM marketplace, and that only the most common prescription drugs were included in the search protocol, plaintiffs offer no alternative base figure for comparison.

[10] After defendants submitted their summary judgment motion, plaintiffs further refined their results and dismissed some of their claims.  Defendants then filed an amended memorandum of law to reflect plaintiffs' changes to the matching results.  Docket Entry 698.  In the amended memorandum, defendants calculate that 87% of plaintiffs' claims are based on five or fewer lost customers per year.  Docket Entry 698-1 at 10.

at 22.  The following chart summarizes the de minimus number of lost customers with respect to each of the defendants:

| Defendant | No. of pharmacies with 10 or less lost customers total | Percentage of pharmacies with 10 or less lost customers | No. of pharmacies that lost only 1 customer total | No. of dismissed claims for zero matches |
|---|---|---|---|---|
| Abbott | 16 | 57% | 5 | 3 |
| Novartis | 19 | 68% | 3 | 1 |
| Johnson & Johnson | 18 | 64% | 6 | 4 |
| Upjohn/Pfizer | 4 | 14% | 0 | 1 |
| Hoechst Marion Roussel (Marion Merrell Dow)/Rhone Poulenc Rorer ("HMR (MMD)/RPR") | 12 | 43% | 2 | 2 |
| **Total** | 69 | 49% | 16 | 11 |

Pl. Opp. at 22.  Excluding Upjohn, the defendant that consistently had the highest number of matches, and Pharma-Card, which I conclude for reasons discussed below has substantially overstated its results, none of the plaintiff pharmacies lost more than 50 total customers per defendant over the relevant twelve-year time period, or less than five customers per year per defendant.  *Id*.

When examined on a per-plaintiff basis – again, with the arguable exception of plaintiff Pharma-Card – similarly insignificant results are obtained.  Even Klein's Pharmacy, the plaintiff with the highest number of lost transactions identified by the matching process, lost a total of only 2,521 transactions, or approximately 252 transactions per year.  Pl. Opp. at 23.  This

amounts to only slightly more than 1% of the total BNPD transactions conducted by an average retail pharmacy during any one year (252/22,000).

In short, no matter how analyzed, the matching process identified only a de minimus number of lost customers and transactions.

### 2. Plaintiff Pharma-Card Prescription Services

As noted above, plaintiff Pharma-Card claims to have lost a large number of customers other than those identified by the matching process.  More specifically, Pharma-Card asserts that it lost approximately 2,586 customers as a result of defendants' price discrimination, or nearly half of the 5,500 lost customers claimed by all 28 of the plaintiffs.[11]  Def. R.56.1 ¶ 89.  Most of these customers, however, were not identified by the matching process, but were instead added to the results manually by plaintiffs based upon the belief held by Pharma-Card's employees that certain customers were lost to favored purchasers because of defendants' price discrimination. *Id*. ¶ 85(a) (denied by plaintiffs); *see* Pl. Opp. at 17-19.  Almost 2,000 of these customers were submitted for matching, but only five were identified in the records of the favored purchasers as having filled subscriptions for BNPDs with them.  Def. R.56.1 ¶¶ 90-91; Def. Mem. at 28-29.  Moreover, at least during part of the twelve-year period covered by the matching process, Pharma-Card operated at fourteen separate retail locations.  Pl. Opp. at 17.  Even if all 2,586 customers were properly included in the matching process results, it would show only that approximately 184 customers were lost per retail location, or that Pharma-Card lost only about 18 customers per year at each of its locations.[12]

---

[11] In their memorandum in opposition to summary judgment, plaintiffs contend that Pharma-Card lost 2,773 customers.  Pl. Opp. at 22.

[12] Pharma-Card identified a total of 1,669 lost transactions through the matching process.  Pl. Opp. at 23.  I presume that the number of claimed lost transactions is smaller than the number of lost customers because lost transactions were determined solely from the matching process and not manually supplemented.  Even if Pharma-Card operated at a single retail location, this would amount to approximately 160 lost transactions per year, a tiny sum when compared to the more than 22,000 BNPD transactions conducted annually by the average retail pharmacy.

### 3.   Other Evidence of Damages

Finally, plaintiffs seek to rely on their own affidavits in which they claim to have lost customers and transactions in addition to those identified through the matching process.  Teitjen Decl., Docket Entry 686, Exs. 20-48.  These affidavits are not properly considered as evidence of plaintiffs' lost sales for at least two reasons.  First, plaintiffs offer no convincing explanation for the failure of the matching process to identify the lost customers referenced in these affidavits.[13] Second, and perhaps most significantly – and this applies with equal force to those Pharma-Card customers that were manually added to the matching process results – plaintiffs entered into a stipulation, filed with the Court on August 8, 2011, explicitly providing that the matching process would "determine *the universe* of potential lost customers that Plaintiffs claim they lost as a result of the pricing practices of Defendants." [14]  Stipulation ¶ 1, Docket Entry 666-1 (emphasis added).

### DISCUSSION

### A.  Standards Governing Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  In reaching a summary judgment determination, the court must resolve ambiguities and draw reasonable inferences in favor of the nonmoving party.  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

---

[13] Plaintiffs do contend that some customers were lost to favored purchasers other than those whose data was used in the matching process.  Pl. Opp. at 15, 19.  It was plaintiffs, though, who selected the favored purchasers whose data would be included.

[14] In addition, reports of customers as related by pharmacy employees are arguably hearsay.  *See, e.g.*, Teitjen Decl. Ex. 20, Tallman Aff. ¶ 8 & Ex. B at 4; *id*. Ex. 23, Mouret Aff. ¶ 10; *id*. Ex. 29, Ellison Aff. ¶ 10.  However, the Second Circuit has explicitly permitted testimony of the same type pursuant to Federal Rule of Evidence 803(3) when offered in antitrust cases to prove customers' motives.  *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc.*, 635 F.2d 118, 128 (2d Cir. 1980); *Herman Schwabe, Inc. v. United Shoe Mach. Corp*., 297 F.2d 906, 914 (2d Cir.), *cert. denied*, 369 U.S. 865 (1962).

Two additional principles inform my review of defendants' motion.  First, the Second Circuit has held that "summary judgment is particularly favored [in antitrust cases] because of the concern that protracted litigation will chill pro-competitive market forces."  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (citing *Tops Mkts, Inc. v. Quality Mkts, Inc.*, 142 F.3d 90, 95 (2d Cir. 1998)).  *See also Am. Banana Co., Inc. v. J. Bonafede Co., Inc.*, 407 Fed. App. 520, 522 (2d Cir. 2010).  The Circuit stressed in *Pepsico* that a party may demonstrate that it is entitled to summary judgment by pointing to an absence of evidence to support the nonmoving party's case.  *PepsiCo*, 315 F.3d at 105.

Second, the Supreme Court, in its most recent decision addressing the Robinson-Patman Act, urged lower courts to construe the Act narrowly.[15]  *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 181 (2006).  The Court cited its much earlier decision in *Automatic Canteen Co. of America v. FTC*, 346 U.S. 61, 63 (1953), which it described as "cautioning against Robinson-Patman constructions that extend beyond the prohibitions of the Act and, in doing so, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation."  *Id.* at 181.  Even Justice Stevens, who dissented in *Volvo*, noted that the Act "may well merit [noted antitrust law scholar] Judge [Robert] Bork's characterization as 'wholly mistaken economic theory.'"  546 U.S. at 187.  *See also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 227 (3d Cir. 2008) (describing the Supreme Court's decision in *Volvo* as narrowly construing the Robinson-Patman Act).

---

[15] The Court has, on other occasions, stated that the Robinson-Patman Act should be construed liberally and "broadly to effectuate its purpose."  *Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 11 (1976), *quoted in Jefferson Cnty. Pharm. Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 159 (1983).  Although *Volvo* does not disavow these prior decisions, the *Volvo* decision does seem to place more emphasis on the possible anti-competitive effects of the Robinson-Patman Act than prior decisions.  At least one scholar has noted that the Robinson-Patman Act has "come into disfavor" during the last quarter century.  Daniel J. Gifford & Robert T. Kudrle, *The Law and Economics of Price Discrimination in Modern Economies: Time for Reconciliation?*, 43 U.C. Davis L. Rev. 1235, 1269 (2010).

With this guidance in mind, I now consider whether plaintiffs' evidence, revealing as it does that plaintiffs lost only a trivial number of customers and sales to favored purchasers, is nevertheless sufficient to support a Robinson-Patman Act claim.  For the reasons explained below, I conclude that it is not.

### B.  The Robinson-Patman Act

Section 2(a) of the Robinson-Patman Act (the "Act"), an amendment to the Clayton Act, renders it

> unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).[16]

To succeed on a Robinson-Patman claim, a plaintiff must establish: "(1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition." *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 141 (2d Cir. 1998).  As is frequently the case, only the fourth element – proof of what is referred to as "competitive injury" – is at issue here.[17]  Indeed, as the Second Circuit has stated,

> [t]he language in Section 2(a) relating to injury to competition is the key to the legality of most differential pricing practices and has engendered significant legal authority as courts have struggled to determine what

---

[16] Plaintiffs also assert claims pursuant to Sections 2(d) and 2(f) of the Robinson-Patman Act, discussed *infra*.

[17] Defendants do not contest, for purposes of the pending motion, plaintiffs' allegations of discriminatory pricing. Indeed, the Seventh Circuit, ruling on appeal from a grant of judgment as a matter of law against the plaintiff class, stated that "the manufacturers of brand name prescription drugs engage in price discrimination . . . .  Everyone knows this."  *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786 (7th Cir. 1999).

> degree and type of market consequences will constitute the proscribed
> statutory effect on competition in various commercial situations.

*George Haug Co.*, 148 F.3d at 141.

A plaintiff seeking damages under the Act must not only demonstrate a competitive injury as required by the Act itself, but must also satisfy Section 4 of the Clayton Act, 15 U.S.C. § 15, by establishing an "antitrust injury." *Id.* at 422-24.  That is because the Robinson-Patman Act does not provide for a private right of action; instead, "the private right of action for a § 2(a) Robinson-Patman Act claim, as for all private plaintiff antitrust rights of action, is provided by § 4 of the Clayton Act." *Drug Mart II*, 472 F. Supp. 2d at 422.  The "antitrust injury" requirement "compels plaintiffs to show that they were in fact injured by price discrimination, that the injury is of the type the Act was intended to prevent, and that the injury is causally connected with the violation of the Act." *Id.* at 423 n. 44 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977)).

In enacting Robinson-Patman, "Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand."  *Volvo*, 546 U.S. at 175.  The purpose of the Act is to prohibit "price discrimination only to the extent that it threatens to injure competition."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993).  The Supreme Court emphasized this point in *Volvo,* where it warned against "interpretation[s of the Act] geared more to the protection of existing *competitors* than to the stimulation of *competition.*"  546 U.S. at 181 (emphasis in original).[18]

---

[18] In opposing summary judgment, plaintiffs cite cases suggesting that a showing of injury to a competitor is sufficient to establish competitive injury, even in the face of proof that competition remains healthy.  Pl. Opp. at 40 (citing *Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997) (referring to "Congressional

The parties' submissions do not directly address whether defendants' pricing practices have had any impact on the competitiveness of the market for BNPDs. For example, neither side has presented any evidence regarding whether or how defendants' discount and rebate programs have affected the availability of BNPDs to patients or the amounts patients, or their health insurance providers, must pay for them. Rather, both sides focus on whether the injury, or lack thereof, sustained by plaintiffs is sufficient to demonstrate competitive or antitrust injury. Because the parties have not addressed the impact on competition generally, and because it is difficult to conceive of an adverse impact on competition absent a significant diversion of sales, I do not separately consider whether defendants' pricing practices have adversely affected competition in the market for BNPDs from a consumer's point of view.

### 1. Competitive Injury

There are "three categories of competitive injury that may give rise to a Robinson-Patman Act claim: primary line, secondary line, and tertiary line." *Volvo*, 546 U.S. at 176. This case, like *Volvo*, involves a secondary line claim, or a claim of "price discrimination that injures competition among the discriminating seller's customers," described as "'favored' and 'disfavored' purchasers."[19] *Id*. "A hallmark of the requisite competitive injury [in a secondary line claim] . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Id*. at 177. In other words, and as plaintiffs' commitment to the matching process

---

intent to protect individual competitors, not just market competition") and *J.F. Feeser, Inc. v. Serv-a-Portion, Inc.*, 909 F.2d 1524, 1535 (3rd Cir. 1990) (holding that "evidence of injury to a competitor may satisfy the component of competitive injury necessary to show a violation of the Robinson-Patman Act")). *See also Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1418 n.6 (11th Cir. 1990) (citing cases and finding that "the legal focus of the competitive injury inquiry is on the competitor, not the consumer"). The language from *Volvo* quoted in the text raises a question about the continued viability of these holdings.

[19] A plaintiff seeking to establish competitive injury in a secondary-line case must prove that it was a disfavored purchaser engaged in actual competition with a favored purchaser(s) at the time of the price differential. *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir. 1987). Defendants apparently do not dispute, at least for purposes of this motion, that plaintiffs and the favored purchasers whose data was used in the matching process were in competition.

reflects, a Robinson-Patman Act claimant may not rely on the effect of price discrimination on the market generally.  Rather,

> [t]he plaintiff disfavored purchaser must show that it lost customers or profits because the favored purchaser used its favored advantage either to lower its resale prices or otherwise to attract business.  It is for that reason that a plaintiff asserting a claim under the Act must proffer individualized proof of lost customers or profits as against each defendant.

*Drug Mart I*, 378 F. Supp. 2d at 139.  *See also O'Connell v. Citrus Bowl, Inc.*, 99 F.R.D. 117 (E.D.N.Y. 1983) (denying plaintiffs' motion for class certification of Robinson-Patman Act claims because each putative class member's proof of competitive injury would be highly individualized).

The Robinson-Patman Act prohibits price discrimination only "where the effect of such discrimination may be substantially to lessen competition."  15 U.S.C. § 13(a).  Applying this statutory language, the Supreme Court in *Volvo* held that an automobile manufacturer defendant was entitled to judgment as a matter of law following a jury verdict in favor of a plaintiff car dealer.  In *Volvo*, the plaintiff car dealer claimed that, with respect to certain trucks designed to a customer's specifications, defendant Volvo offered other dealers more favorable price concessions than it received.  Plaintiff's difficulty in establishing a Robinson-Patman Act violation stemmed from the fact that he rarely competed with other Volvo dealers over the same truck customers.  In fact, plaintiff was able to present evidence of only two occasions over five years when it competed against another Volvo dealer for a particular sale, and a "loss of only one sale of 12 trucks that would have generated $30,000 in gross profits."  546 U.S. at 180.  While the Court focused primarily on the absence of proof that Volvo dealers simultaneously competed with each other for the same retail customers, it also indicated that the limited evidence of lost sales presented by the plaintiff was insufficient to establish competitive injury, stating that "if

18

price discrimination between two purchasers existed at all, it was not of such magnitude as to affect substantially competition between [plaintiff] and the 'favored' Volvo dealer." *Id.  See also United Magazine Co., Inc. v. Curtis Circulation Co.*, 279 Fed. Appx. 14, 17-18 (2d Cir. 2008); *Interstate Cigar Co. Inc. v. Sterling Drug Inc.*, 655 F.2d 29, 31 (2d Cir. 1981) (stating that plaintiffs failed to establish that any price discrimination or discount to a favored purchaser "would tend to lessen competition substantially").

Other courts have similarly rejected Robinson-Patman Act claims for failure to demonstrate a substantial anti-competitive impact.  For example, the Fifth Circuit, on remand from the Supreme Court, rejected another car dealer's claim because, among other things, the plaintiff failed to establish that the incentive programs he challenged were likely to have a substantial effect on competition. *Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 581 (5th Cir. 1982).  In words directly applicable to defendants' pending motion, the Fifth Circuit stated:

> In order to show a violation of Section 2(a) of the Robinson-Patman Act a plaintiff must demonstrate the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from him, the disfavored competitor.

670 F.2d at 580.  *See also O'Connell*, 99 F.R.D. at 122 (favorably citing the language from *J. Truett Payne* quoted above).  In *Boise Cascade Corp. v. Federal Trade Commission*, 837 F.2d 1127 (D.C. Cir. 1988), a contention of competitive injury was rejected in part because the number of accounts (162) that switched from the disfavored purchasers to the favored purchaser "was quite small."  837 F.2d at 1145.  *See also Lupia v. Stella D'Oro Biscuit Co., Inc.*, 586 F.2d 1163, 1171 (7th Cir. 1978) (dismissing primarily because of a lack of competition between plaintiff and any favored purchaser for the same customers and stating that a plaintiff who "has not alleged that its sales lost due to secondary price discrimination were more than 'de

minimus'" has failed to establish a cognizable competitive injury); *Erickson's Flooring & Supply Co. v. Basic Coatings, Inc.*, 2007 WL 3036747, at *6 (E.D. Mich. Oct. 15, 2007) (finding that "only one instance of discriminatory pricing towards one other distributor in relation to only one customer [was insufficient]. Indeed, Plaintiff's claim is weaker than the one pressed in *Volvo Trucks*, because Plaintiff does not claim that the allegedly lower prices given to Erickson's Decorating even cost it any sales; it alleges that this discrimination hurt its profit margin at only one point in time, in relation to only one customer. . . . Plaintiff has provided no evidence that the alleged price concession might have had anything approaching a "substantial" effect on competition."). Here, the effect of defendants' pricing practices has been carefully measured, and the results undermine any contention that plaintiffs have suffered a significant loss of sales.

The decision in *De Modena v. Kaiser Foundation Health Plan, Inc.*, 743 F.2d 1388 (9th Cir. 1984), *cert. denied*, 469 U.S. 1229 (1985), is of particular interest because it involved, like this case, allegations of price discrimination in the market for prescription drugs. Defendants in *De Modena* operated health plans that provided medical care to their members in return for monthly dues. The services defendants provided to their members included a prescription drug plan. Plaintiffs, retail pharmacies, brought Robinson-Patman Act claims, contending that defendants were able to acquire drugs at discriminatorily low prices. The Court in *De Modena* held that, with respect to drugs provided to their own members, defendants were protected from liability by an exception to the Robinson Patman Act applicable to transactions made by non-profit institutions for their own purposes. The court found, though, that defendants also made sales to "walk-in" customers who were not their members, and that these sales were thus not covered by the "own purposes" exception described above. The district court dismissed plaintiffs' claim despite these walk-in sales on the grounds that they constituted less than one

percent of defendants' total drug sales and were therefore de minimus.  The Ninth Circuit reversed, but not on the ground that the district court wrongly concluded that a de minimus number of sales is not actionable; rather, the Ninth Circuit held that whether the sales at issue were de minimus or not should be determined by measuring their effect on competition, not by calculating the portion of defendants' sales they represented.  743 F.2d at 1394-95.  Indeed, if a de minimus number of diverted sales were sufficient, it would not matter how they were measured, and the Ninth Circuit would have had no reason to remand.

In this case, of course, the matching process measured the number of customers drawn from plaintiffs to favored purchasers, and defendants in support of their motion seek to examine that number in the context of the BNPD sales volume of a typical retail pharmacy.  The reasoning in *De Modena* accordingly supports defendants' position here.

In response to defendants' argument that the limited number of lost sales demonstrated by the matching process precludes their Robinson-Patman Act claims, plaintiffs invoke what has come to be known as the "*Morton Salt*" inference.  The inference takes its name from the decision in *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948), where the Supreme Court stated:

> It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers.  This showing in itself is sufficient to justify our conclusion that . . . findings of injury to competition were adequately supported by evidence.

344 U.S. at 49-51.  In *Volvo*, the Supreme Court described *Morton Salt* as recognizing that "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." 546 U.S. at 177.

Plaintiffs contend, in essence, that the results of the matching process do not preclude their claims because the *Morton Salt* inference provides them with an alternative means of demonstrating likely competitive injury.  As a general matter, plaintiffs are correct: a Robinson-Patman plaintiff may typically establish competitive injury in one of two ways: "proof of lost sales or profits, or under the *Morton Salt* test, proof of a substantial price discrimination between competitors over time."  *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1535 (3d Cir. 1990) (internal citations omitted).

The problem for plaintiffs is that this is not a typical case.  The *Morton Salt* inference is just that – an inference – and it is subject to rebuttal.  Thus, as noted above, the Supreme Court in *Volvo* referred to the *Morton Salt* inference as a "permissible" one that "may" arise under certain circumstances.  Even before *Volvo*, the Supreme Court had pointed out that, "[i]n the absence of direct evidence of displaced sales," the *Morton Salt* inference "may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits."  *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983).  Similarly, in *Boise Cascade*, the Circuit Court held that

> The [*Morton Salt*] inference can . . . be overcome by evidence showing an absence of competitive injury within the meaning of Robinson-Patman. That is to say, a sustained and substantial price discrimination raises an inference, but it manifestly does not create an irrebuttable presumption of competitive injury.

837 F.2d at 1144.

Here, plaintiffs have undertaken an extensive, costly and time-consuming effort to trace the customers they claim to have lost to favored purchasers because of price discrimination, but have essentially come up empty.  Moreover, their efforts to point to other evidence of competitive injury fail for several reasons, not the least of which is that they have stipulated that

the results of the matching process would define the "universe of potential lost customers" they would claim they lost as a result of the defendants' pricing practices. Stipulation ¶ 1, Docket Entry 666-1. Under these circumstances, any inference has been rebutted; the assumption that a substantial price difference over time would result in customers leaving plaintiffs for favored purchasers has been carefully tested, but no meaningful evidence of lost sales has been developed.

As plaintiffs contend, there is authority that suggests that the Act has no substantiality requirement. *See*, *e.g.*, *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1020-22 (2d Cir. 1989) (assuming that plaintiff suffered a competitive injury even though plaintiff cited only three instances of lost sales but finding that plaintiff failed to establish a causal connection between any lost sales and alleged Robinson-Patman violations); *Precision Printing Co., Inc. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 353 (W.D. Pa. 1998) (finding that plaintiff "raise[d] a genuine issue of material fact on the issue of competitive harm" based on evidence that "at least one customer shifted business away from plaintiff because it was no longer price-competitive" but denying/granting summary judgment because there was no Robinson-Patman violation); *Capital Ford Truck Sales, Inc. v. Ford Motor Co.*, 819 F. Supp. 1555, 1578 (N.D. Ga. 1992) (holding that "[t]he *de minimis* injury doctrine applies only when a plaintiff has no direct evidence of lost sales and adduces proof of competitive injury through evidence of substantial price discrimination over time"); *see also* 3A FED. JURY PRAC. & INSTR. § 150.205 (requiring plaintiff to "show there is a reasonable possibility that the alleged price discrimination may have harmed competition. Plaintiff is not required to show that the alleged price difference actually harmed competition.") (citing *Corn Products Refining Co. v. Fed. Trade Comm'n*, 324 U.S. 726 (1945)); *The Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703,

711 n.9 (2d Cir. 1983) (affirming a jury charge that stated that "the plaintiff must establish by a fair preponderance of the evidence that it suffered a loss of sales and consequently a loss of profit because of the illegal price discrimination . . . .  The loss of Bohack may be shown by showing that the price discrimination diverted sales from Bohack that Bohack lost sales and therefore profit.  It is not necessary that you find that competition was in fact lessened, injured or damaged, but only that the acts of the defendant may have substantially lessened competition, injured or destroyed some competition."); *Cf. Gen. Auto Parts Co. v. Genuine Parts Co.*, 2007 WL 704121, at *6 (D. Idaho Mar. 5, 2007) (denying summary judgment after finding that there were disputes of fact on whether any price discrimination "might" have substantially lessened competition).  However, after reviewing all of the pertinent authorities, and relying in particular on the Supreme Court's most recent pronouncement in *Volvo*, I conclude that a Robinson-Patman claim requires a showing of substantial competitive injury and that the de minimus sales identified by the matching process are insufficient to establish such an injury.  546 U.S. at 180.

For all these reasons, I conclude that plaintiffs have failed to demonstrate sufficient competitive injury to sustain their Robinson-Patman Act claims.  Accordingly, defendants are entitled to summary judgment.

### 2. *Antitrust Injury*

As noted above, a plaintiff seeking to recover damages on a Robinson-Patman claim must establish an antitrust injury.  An antitrust injury is an "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).  *See also Dayton Superior Corp. v. Marjam Supply Co.*, 2011 WL 710450 at * 6 (E.D.N.Y. Feb. 22,

2011).  Even if plaintiffs' claims were not subject to dismissal for failure to raise a question of

fact with respect to competitive injury, I would grant defendants' summary judgment motion

because plaintiffs have, largely for the reasons discussed above, also failed to present evidence of

antitrust injury.

Price discrimination does not entitle a disfavored purchaser to "automatic damages." *J.*

*Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981).  Rather,

> [f]or purposes of Robinson-Patman secondary line cases, antitrust injury is
> the competitor's unfair competitive edge that is used to attract sales or
> profits from the plaintiffs.  Thus, the injury must be traced to the
> competitor's competitive use of their price advantage.[20]

*Drug Mart II*, 472  F. Supp. 2d at 424  (citing *Uniroyal , Inc. v. Jetco Auto Serv., Inc.*, 461 F.

Supp. 350, 358 (S.D.N.Y. 1978)).  In other words, "[i]f the price discrimination . . . was the

cause of the plaintiffs' injury, the plaintiffs should be able to match up their losses with gains to

the favored competitors." *Id*. at 424-25 (quoting *Hasbrouck v. Texaco, Inc.*, 1980 WL 1843 at

*19 (E.D. Wash. Mar. 31, 1980), *aff'd in part, rev'd in part*, 663 F.2d 930 (9th Cir. 1981).

Except to the minimal extent described above, plaintiffs here, despite tremendous effort, have

been unable to "match up their losses" with gains to the favored purchasers.  Plaintiffs have

identified less than 3% of their total lost customers as having purchased BNPDs from favored

purchasers, undermining any inference that price advantages enjoyed by favored purchasers

---

[20] Judge Glasser discussed the standard to apply in analyzing antitrust injury as follows:
> First, the plaintiffs must prove the fact of antitrust injury; second, they must make a
> showing regarding the amount of damages in order to justify an award by the trier of fact.
> . . .  [P]laintiffs' burden of proving the fact of damage under § 4 of the Clayton Act is
> satisfied by its proof of some damage flowing from the unlawful conspiracy.  Once
> causation is established, the jury is permitted to calculate the actual damages suffered
> using a "'reasonable estimate, as long as the jury verdict is not the product of speculation
> or guess work.'"  The plaintiffs therefore must proffer evidence of some damage, with the
> recognition that the actual amount need not be proven to the same degree of certainty as
> proving some quantum of damages.

*Drug Mart II*, 472 F. Supp. 2d at 423-24 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114
(1969) and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

caused plaintiffs' injury. Where the evidence of lost sales is as de minimus as it is here, it cannot support a finding of a causal connection between lost sales and the alleged price discrimination.

Although there appear to be few precedents on point, the relevant decisions do suggest that a trivial effect on a claimant's sales is insufficient to demonstrate antitrust injury. For example, in *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17 (1st Cir. 1981) (Breyer, J.), the First Circuit rejected plaintiff's claim, holding that because "the affected sales were but a tiny fraction of its total business," plaintiff was unable "to show any significant actual injury." *Id*. at 23. A similar analysis contributed to the dismissal in *Hygrade Milk and Cream Co. v. Tropicana Products, Inc.*, 1996 WL 257581 at *18-19 (S.D.N.Y. May 16, 1996) (rejecting claim of antitrust injury where lost sales were, at best, "insignificant").

Because they are essentially unable to match up a significant number of the customers they lost with those the favored purchasers gained, plaintiffs have failed to demonstrate antitrust injury. *But see U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377 (2d Cir. 1988) (affirming that an antitrust plaintiff may recover nominal damages under the Clayton Act, albeit in the context of a Sherman Act claim). Defendants are therefore entitled to summary judgment on this ground as well.

> 3. *Equitable Relief*

Plaintiffs seek equitable relief as well as damages. Injunctive relief "against threatened loss or damage by a violation of the antitrust laws" is available pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. If a Robinson-Patman plaintiff establishes all the elements of its prima facie claim, including competitive injury, injunctive relief may be granted without any showing of antitrust injury.

Although the matter was not explicitly raised by the parties in their motion papers, plaintiffs' claims for equitable relief are foreclosed by Judge Glasser's decision in *Drug Mart III,* 2007 WL 4526618 (E.D.N.Y. Dec. 20, 2007).   In that decision, Judge Glasser considered whether his decision granting defendants summary judgment with respect to plaintiffs' damages claims was dispositive of, or even relevant to, plaintiffs' claims for equitable relief.  Judge Glasser determined that plaintiffs' equitable relief claims could not survive, and rendered a thorough decision that explained his reasoning in great detail.  Little would be served by retracing Judge Glasser's steps here; I therefore simply summarize his decision as follows. Citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986), Judge Glasser recognized that, generally, a plaintiff may obtain equitable relief from price discrimination merely by demonstrating a threat of antitrust injury, and need not establish actual injury and damages.  *Id.* at *6.  Judge Glasser went on to conclude, however, that

> where the allegedly anticompetitive conduct has been ongoing for a substantial period of time, the distinction between Section 4's requirement of actual injury and Section 16's more liberal requirement of threatened injury tends to shrink or disappear.  If the plaintiff cannot show itself to have suffered some actual injury of the type the antitrust laws were intended to prevent from a purportedly anticompetitive practice in which the defendant has engaged for a substantial portion of time, the plaintiff is effectively presumed to be unable to establish the existence of a threat of future injury arising from that same conduct in the future, at least absent some plausible explanation why a practice that has not created a cognizable injury in the past creates a credible risk of doing so in the future if permitted to continue.

*Drug Mart III,* 2007 WL 4526618, at *13 (relying on *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C. Cir. 1977), *Ashley Meadow Farms, Inc. v. Am. Horse Shows Ass'n, Inc.*, 617 F. Supp. 1058 (S.D.N.Y. 1985), and *Machovec v. Council for the Nat'l Register of Health Serv. Providers in Psych., Inc.*, 616 F. Supp. 258 (E.D. Va. 1985)).

Accordingly, Judge Glasser granted summary judgment to the designated defendants with

respect to the designated plaintiffs' claims for equitable relief.  Because plaintiffs have failed to

demonstrate competitive injury, Judge Glasser's decision controls here, and it requires dismissal

of plaintiffs' claims for injunctive relief.

### 4.  Section 2(d) and 2(f) Claims

Plaintiffs also bring claims pursuant to Sections 2(d) and 2(f) of the Act.  15 U.S.C.

§§ 13(d), (f).[21]  Because 2(f) claims are derivative in nature and I find that plaintiffs failed to

establish their 2(a) claims, defendants' motion for summary judgment with respect to the 2(f)

claims is granted.  *See Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*, 88 F. Supp. 2d 133, 137

(S.D.N.Y. 2000).  Section 2(d) does not require plaintiffs to establish competitive injury, *Blue*

*Tree Hotels*, 369 F.3d at 219 (citing *FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65 (1959));

*Hygrade Milk & Cream Co.*, 1996 WL 257581, at *13; under the Clayton Act, however,

plaintiffs must establish antitrust injury.  Because I find that plaintiffs have failed to establish

antitrust injury, defendants' motion for summary judgment with respect to the 2(d) claims is also

granted.

---

[21] Section 2(d) prohibits

> any person engaged in commerce to pay or contract for the payment of anything of value
> to or for the benefit of a customer of such person in the course of such commerce as
> compensation or in consideration for any services or facilities furnished by or through
> such customer in connection with the processing, handling, sale, or offering for sale of
> any products or commodities manufactured, sold, or offered for sale by such person,
> unless such payment or consideration is available on proportionally equal terms to all
> other customers competing in the distribution of such products or commodities.

15 U.S.C. § 13(d).  Section 2(f) provides that it is "unlawful for any person engaged in commerce, in the course of
such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."  *Id*.
§ 13(f).

**CONCLUSION**

For all these reasons, defendants' motion for summary judgment is granted.

SO ORDERED.

Dated:        Brooklyn, New York
             August 16, 2012

                                    _____/s/_____
                                    STEVEN M. GOLD
                                    United States Magistrate Judge

*U:\eoc 2012\drug mart\m&o final.docx*